IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 8, 2022

## STATE OF TENNESSEE v. HANS BANKS

**Appeal from the Criminal Court for Shelby County**
**No. C1908807     James M. Lammey, Judge**
_____

### No. W2021-01038-CCA-R3-CD
_____

Defendant, Hans Banks, was indicted by the Shelby County Grand Jury for second degree murder. After a trial, Defendant was convicted of the lesser-included offense, voluntary manslaughter, and received a sentence of six years. On appeal, Defendant argues that the trial court erred in denying his motion to suppress his statements given to the police and that the evidence was insufficient to support his conviction of voluntary manslaughter. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Shae Atkinson, Memphis, Tennessee, for the appellant, Hans Banks.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Greg Gilbert and Michael Haas, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In the early hours of July 7, 2019, Defendant approached police officers in a Taco Bell parking lot and notified them of a possible dead body in his apartment. The officers transported Defendant back to his apartment. Shortly thereafter, the officers followed Defendant to the police station where Memphis Police Department ("MPD") Sergeant

Billy Byrd interrogated him.[1]  Defendant gave a statement and confessed to killing the victim, Joseph Hurdle, in self-defense.

*Motion to Suppress Defendant's Statements*

Defendant filed a pretrial motion to suppress his statements made to Sergeant Byrd.  Defendant alleged that his statements were involuntarily given and that he invoked his right to counsel.  The trial court held a suppression hearing on September 29, 2020.

Sergeant Byrd testified that he interviewed Defendant on July 7, 2019.  He asked Defendant whether he could read and write without eyeglasses.  Defendant said yes.  Sergeant Byrd asked Defendant whether he was under the influence of any intoxicants or drugs and whether he suffered from any mental disorders.  Defendant replied no.  Sergeant Byrd asked Defendant whether he understood that Sergeant Byrd was a police officer.  Defendant said he understood.  Sergeant Byrd recalled Defendant said he was not in pain and that he completed twelfth grade.

Sergeant Byrd confirmed that Defendant responded to his questions and followed his instructions regarding the Advice of Rights form.  Defendant initialed next to each of his rights on the form.  Sergeant Byrd confirmed Defendant signed the waiver of his rights after initialing next to each right.  Sergeant Byrd testified Defendant was unsure whether he wanted an attorney.  Sergeant Byrd confirmed Defendant agreed to answer questions without an attorney present.  When asked whether Defendant invoked his right to remain silent, Sergeant Byrd replied, "No, sir."  Sergeant Byrd denied that he coerced Defendant into giving a statement.  Sergeant Byrd said, "to the best of his knowledge," Defendant gave his statement freely and voluntarily.

The parties stipulated to playing a three-minute segment of an approximately five-hour-long recorded interrogation video.  In the video, Defendant asked, "how long would it take to have a lawyer get here?"  Sergeant Byrd replied, "I don't know how long.  Um, I can't tell you that.  Um, but, when we get through the [Advice of Rights] form, when we get to that point, then we can look into it.  It's up to you."  Sergeant Byrd testified that he did not believe Defendant's question was an invocation of his right to counsel.

On cross-examination, Sergeant Byrd admitted Defendant may have been "a little sleep deprived," but "he was alert enough to follow instructions."  Defense counsel asked Sergeant Byrd why he did not ask follow-up questions to Defendant about his attorney

---

[1] The technical record and parties' briefs also refer to Sergeant Byrd as Lieutenant Boyd.  In July 2019, Billy Byrd was a sergeant with the MPD.  In the suppression hearing and trial transcripts, the sergeant spells his last name, "B-Y-R-D."  For clarity, we will use Sergeant Byrd throughout our opinion.

inquiry. Sergeant Byrd responded, "He's a 37[-]year-old man. If he wants an attorney and he's obviously alert, oriented, he knows -- . . . He never came back to it." On re-direct examination, Sergeant Byrd testified that it was common practice to offer water and snacks and that somebody most likely provided them to Defendant.

Defendant testified that prior to reviewing the Advice of Rights form, he had a "casual conversation" with Sergeant Byrd. Defendant said he understood what he was reading in the Advice of Rights form, but then claimed he did not understand he was giving up all his rights as he was signing the form. Defendant recalled asking Sergeant Byrd how long it would take to get an attorney. Defendant said he thought "it was self-explanatory" that he wanted an attorney. On cross-examination, Defendant claimed he said, "When can we start the process to get me an attorney?" Defendant explained that his words included the statement, "Get me an attorney." The State replayed the three-minute interrogation video segment. Afterward, Defendant admitted that he said, "How long would it take to have a lawyer [here]?"

At the conclusion of the hearing, the trial court issued an oral order denying Defendant's motion to suppress. The court found that Sergeant Byrd "did an excellent job of determining whether or not [Defendant] was lucid." The trial court further found Defendant unequivocally waived his rights when he initialed next to each right and signed the Advice of Rights form. The court determined that Defendant did not unequivocally invoke his right to counsel. The matter proceeded to trial on June 7, 2021.

*Trial*

Donnie Hurdle, the victim's brother, testified that the victim was 59 years old at the time of his death. Mr. Hurdle testified that the victim was approximately five feet, five inches tall and weighed around 140 pounds.

Michael Carter testified that in the early hours of July 7, 2019, he drove his son to the Cabana Apartments in Memphis to meet a friend named Blue. At the time, Mr. Carter did not know Blue. Mr. Carter said that he later learned Blue was Defendant. Mr. Carter received a phone call from his son shortly after dropping him off at the apartments. His son said, "Dad, there's a dead guy in here." When Mr. Carter returned, he went into the apartment. He described the place as "generally a mess." Mr. Carter walked into the bedroom and saw a naked man lying on the floor with "Christmas light type of things around his neck." The man was not breathing. Mr. Carter and his son determined the apartment to be a crime scene and exited it. Mr. Carter called 911. Once the police officers arrived, they separated Mr. Carter and his son, took them to the police station, and asked for written statements. On cross-examination, Mr. Carter admitted that he did not know the actual events that occurred inside the apartment.

MPD Officer Keland English testified he was sitting in his police vehicle in a Taco Bell parking lot around 1:00 a.m. on July 7. Defendant pulled into the parking lot and approached Officer English. Officer English activated his body camera and recorded the interaction. The body camera footage was played before the jury. Officer English testified that when Defendant approached him he said, "It's a possible dead body at my house." On cross-examination, Officer English testified that Defendant also said, "My friend is dead in my apartment." Officer English recalled that Defendant said his friend attacked him. Officer English testified that Defendant was compliant. Officer English said that he transported Defendant back to the apartment complex. Officer English admitted that he had no personal knowledge of what occurred inside the apartment. On re-direct examination, Officer English testified that he did not notice any injuries to Defendant.

MPD Officer Philip Perez photographed Defendant's apartment. Officer Perez described the apartment as "real untidy." He testified that he found the victim in the bedroom. Officer Perez said a lamp was knocked over, items were torn from the wall, and "you could just tell there was some type of struggle." Officer Perez said there was "blood spatter on the doorway to the [bed]room and also on the closet door and on the entryway to the bathroom." The victim had "visible bruising" and "blood on and underneath [him]." Officer Perez testified that the victim was naked and had Christmas tree lights wrapped around his neck. Officer Perez testified that the bathroom was "really clean" and did not find signs "of anything in the bathroom." Officer Perez said he found a knife with a "brown wooden handle" near the victim but it did not contain blood. There was also a bloody ashtray in the bedroom. On cross-examination, Officer Perez admitted that he only assessed the aftermath of the apartment and did not know how the events transpired.

MPD Sergeant Billy Byrd testified that he interrogated Defendant on July 7. Sergeant Byrd testified that he reviewed the entire Advice of Rights form with Defendant. Sergeant Byrd testified that the interrogation was recorded on video. Sergeant Byrd said that he prepared a written statement for Defendant and reviewed it with him after the initial video-recorded interrogation because the video's audio quality was poor. A portion of the video-recorded interrogation was played for the jury. Sergeant Byrd then read the statement to the jury. Sergeant Byrd testified that Defendant's statement "pretty much matched" his video-recorded interrogation. In the statement, Defendant maintained that the victim attacked him and tried to push him into the bathtub with an extension cord. Defendant stated that he and the victim "were both wrapped up in the extension cord." He stated, "That is the last thing I remember and I looked down and we were covered in blood and [the victim] was on top of me."

- 4 -

On cross-examination, Sergeant Byrd reviewed Defendant's written statement with defense counsel. On re-direct examination, Sergeant Byrd confirmed that because the audio from the video-recorded interrogation was difficult to understand, some of his responses were based on his personal experience with Defendant. On re-cross-examination, Sergeant Byrd testified that Defendant was slimmer when he interrogated Defendant than he was at trial. On further re-direct examination, Sergeant Byrd testified that in 2019, Defendant was "bigger than the victim by height and weight[,]" and described Defendant as "lean, muscular. . . . in better shape than [the victim]."

MPD Lieutenant John Stone testified that he was the lead investigator. He testified that "[t]here was no apparent injuries [to Defendant] that considered any kind of medical attention or any kind of life[-]threatening injuries at that time." Lieutenant Stone described Defendant's injuries as abrasions below his left nipple and on his "shoulder area." On cross-examination, Lieutenant Stone testified that Defendant was much larger at trial than at the time of the victim's death.

The State presented Dr. Katrina Van Pelt as an expert in the field of forensic pathology. Dr. Van Pelt performed an autopsy on the victim. Dr. Van Pelt testified that the victim's cause of death was strangulation. Dr. Van Pelt explained that the victim's hyoid bone was broken and confirmed that "a pretty tremendous amount of force ha[d] to be placed around somebody's neck for the hyoid bone to be fractured." Dr. Van Pelt also noted multiple abrasions and contusions on the victim's head, chest, back, arms, and legs. On cross-examination, Dr. Van Pelt testified that when the victim died, he had marijuana, alcohol, and cocaine in his system. Dr. Van Pelt testified that cocaine can cause "erratic behaviors." Defense counsel asked, "what happens to the body if someone is in water and an extension cord gets thrown into that water?" Dr. Van Pelt responded, "They would be electrocuted."

Defendant testified that in July 2019 he weighed approximately 175 pounds. As of trial, Defendant weighed 317 pounds. Defendant testified that he knew the victim for a year and a half. They were "friends with benefits." Defendant testified that the victim was acting strangely on July 6, 2019. Defendant and the victim were "[g]etting high and having intercourse" at Defendant's apartment when they decided to go to Walmart. As they exited the apartment, Defendant testified that he saw "somebody" show the victim a bag full of crack cocaine. The victim drove Defendant to Walmart. Defendant testified that on the way to Walmart, the victim made "hand gestures" outside the car window to cars that were following the victim's car. Defendant recognized the cars from the apartment complex. Defendant became concerned and texted his nephew. Ultimately, Defendant purchased his groceries, and the victim drove him back to his apartment.

Defendant testified that when he and the victim returned from Walmart, the victim asked him if he felt like "fooling around." Defendant said "okay," but shortly thereafter noticed "[e]verything [was] all off." Defendant testified that he began talking with the victim about the victim's family. As Defendant was speaking, the victim picked up a small, blunt knife. Defendant had "no idea what [the victim was] going to do with it" and hit the knife out of his hand. Defendant said that the victim then picked up an ashtray. Defendant took it from him and "patted" the victim on the head with it.

Defendant went to draw a bath because he had a "long, taxing day." He testified that he got into the bathtub while it was half full. The victim entered the bathroom, naked, holding lit Christmas lights. Defendant said he barrel-rolled out of the bathtub and the victim tried to push him back into the water. Defendant said he fought his way out of the bathroom. Once in the bedroom, they began hitting each other on the bed. The Christmas lights were "dangling up on [the victim]." Defendant said they both got "tangled and wrapped up in the cords." Defendant said the victim reached for the small knife again. Defendant bashed the victim's wrist with a black plate and made him drop the knife. The victim picked up the ashtray again. Defendant took it and "pop[ped]" the victim in the head with it at least once. The two got off the bed and Defendant wrapped the Christmas lights around the victim's shoulders two or three times to "restrain" the victim. Defendant testified that he held onto the cord in his right hand, as he "twist[ed] the other way to activate [the victim's cell] phone" so Defendant could shout "call police."

Defendant felt slack in the cords and thought the victim was reaching for the small knife. Defendant started pulling the cords to keep the victim from the knife. Defendant testified that he screamed at the top of his lungs for the police and kept pulling the cords. Defendant was unsure how much time passed, but eventually realized the victim was not moving. Defendant noticed a lot of blood everywhere. Defendant walked into the bathroom to clean off the blood. He used bleach to clean the bathtub and put on clothes. Defendant left the apartment and took the victim's car. Defendant drove to his mother's house. Defendant noticed police officers at a Taco Bell and drove to them. He approached them and asked them to follow him back to the apartment.

On cross-examination, Defendant admitted that he took his time in leaving the apartment. He testified that he used bleach to clean himself because he couldn't "go around with particles and s*** on [him]." Defendant testified that he wanted to see his mother before he fled Memphis. Defendant testified that it took him "a lot of effort to overpower [the victim]."

The jury convicted Defendant of the lesser-included offense of voluntary manslaughter. Following a sentencing hearing, the trial court imposed a sentence of six years. Defendant now appeals.

*Analysis*

On appeal, Defendant argues that trial court erred in denying his motion to suppress and that the evidence was insufficient to support his conviction of voluntary manslaughter. The State responds that the trial court properly denied Defendant's motion to suppress and that the evidence was sufficient. We agree with the State.

A. Motion to Suppress

Defendant argues that he invoked his right to counsel prior to speaking with Sergeant Byrd and therefore the trial court erred in denying his motion to suppress. The State responds that Defendant did not unequivocally invoke his right to counsel and that the trial court properly denied Defendant's motion to suppress.

Both the state and federal constitutions guarantee an accused the right to the assistance of counsel and the right against self-incrimination. The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and to remain silent may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). However, during an interrogation, if the defendant clearly and unequivocally invokes either his right to silence or his right to counsel, the interrogation must immediately cease. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Davis v. United States*, 512 U.S. 452, 459 (1994).

If an accused makes an unequivocal request for an attorney, all interrogation must cease "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an

attorney.'" *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)); *see also State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," questioning need not cease, nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. *Davis*, 512 U.S. at 459 (emphasis in original).

"Whether an individual's request for counsel is equivocal or unequivocal is a mixed question of law and fact that is ultimately subject to de novo review." *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013). Because the trial court's factual determinations were based upon Defendant's video-recorded interrogation, we review the issue de novo. *See id.* (citing *State v. Turner*, 305 S.W.3d 508, 514 (Tenn. 2010) (applying de novo review because the trial court's determination was based on video evidence included in the appellate record). Finally, a conviction may be affirmed, notwithstanding a nonstructural constitutional error, if the State proves beyond a reasonable doubt that the error "did not contribute to the verdict obtained." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (internal quotation marks omitted).

In the video recording of the interrogation, Defendant asks Sergeant Byrd, "How long would it take to have a lawyer here?" Due to echo in the recording, Defendant's next words are unclear. He appears to indicate a lawyer may be helpful and asks again, "How long would it take?" Sergeant Byrd responds, "I don't know how long. Um, I can't tell you that. Um, but, when we get through the [Advice of Rights] form, when we get to that point, then we can look into it. It's up to you." Defendant acknowledges Sergeant Byrd's response and continues completing the Advice of Rights form. Defendant then explains his relationship to the victim and the events that transpired in the early hours of July 7, 2019.

After viewing the video recording, we agree with the trial court's factual determinations. Defendant's initial question is, at best, an equivocal expression of his desire for the presence of counsel. *See Davis*, 512 U.S. at 459. The trial court properly denied the motion to suppress. Defendant is not entitled to relief.

### B. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his conviction for voluntary manslaughter in light of his self-defense theory. The State responds that the evidence was sufficient. We agree with the State.

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn.1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn.1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn.2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this Court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id*.

"Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). Regarding self-defense, Tennessee Code Annotated section 39-11-611(b)(2) provides:

> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b). A defendant can use the defense of self-defense when there is a "genuine, well-founded fear that [the defendant] was in danger of death or great bodily harm[.]" *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). This belief must "meet an objective standard of reasonableness to be justified," and "the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." *State v. Bult*, 989 S.W.3d 730, 732 (Tenn. Crim. App. 1998).

In the light most favorable to the State, the evidence established that Defendant was 37 years old and the victim was 59 years old. Defendant was more muscular than the victim. Defendant testified that the victim picked up a small, blunt knife and Defendant hit it out of his hand. Then, the victim picked up an ashtray and Defendant took it from him. Defendant did not seem to feel threatened because he proceeded to take a bath. Defendant testified that the victim attempted to electrocute him in the bathtub with Christmas lights, but Defendant barrel-rolled out of the bathtub. Defendant and the victim tussled and became tangled in the Christmas lights. Defendant restrained the victim with Christmas lights, but they slipped up his neck. Defendant strangled the victim to death with the cords, applying "tremendous" force to break the victim's hyoid bone. After hearing all the testimonies and arguments, the jury weighed the evidence and found Defendant guilty of voluntary manslaughter, thereby rejecting his theory of self-defense. We conclude that the evidence was sufficient to find Defendant guilty of voluntary manslaughter. Defendant is not entitled to relief.

*Conclusion*

Based on the foregoing, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE